Scott A. Kamber   (*pro hac vice*)
skamber@kamberlaw.com
David A. Stampley (*pro hac vice*)
dstampley@kamberlaw.com
KamberLaw, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Telephone:   (212) 920-3072
Facsimile:    (212) 920-3081

Interim Class Counsel

Avi Kreitenberg (SBN 266571)
akreitenberg@kamberlaw.com
Kamberlaw, LLP
1180 S. Beverly Dr., Ste. 601
Los Angeles, California 90035
Telephone:   (310) 400-1050
Facsimile:    (310) 400-1056

Additional counsel listed on signature page

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE SPECIFIC MEDIA FLASH COOKIES LITIGATION | **CASE NO. CV 10-01256 GW**<br><br>Hon. George H. Wu<br><br>PLAINITFFS' MEMORANDUM AND POINTS OF AUTHORITY IN OPPOSITION TO DEFENDANT SPECIFIC MEDIA, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED, CONSOLIDATED CLASS ACTION COMPLAINT<br><br>Hearing:   Mar. 17, 2011<br>                8:30 a.m.<br>                Courtroom 10 |

# TABLE OF CONTENTS

I.   Introduction ................................................................................................ 1

II.  Factual Background ................................................................................... 2

    A.  Parties .................................................................................................. 2

    B.  Specific Media's Exploitation Campaign Using Flash LSOs ............. 2

III. Plaintiffs' Have Standing ......................................................................... 3

    A.  Standard for Review Article III Standing .......................................... 3

    B.  Plaintiffs Have Article III Standing ................................................... 4

        1.  Consumers' Use of their Personal Information for Economic Exchanges ..... 5

        2.  Valuation of Personal Information ................................................ 8

        3.  Damage to Computers .................................................................... 9

    C.  Plaintiffs' Standing Under the California Unfair Competition Law ................. 11

IV. Plaintiffs Have Sufficiently Pled Their Claims .................................... 13

    A.  Sufficiency of Computer Fraud and Abuse Act Claims Against Specific Media ................................................................................... 14

        1.  Transmission of a Program, Information, Code or Command ................. 14

        2.  Damage or Loss ........................................................................... 14

        3.  Authorization ............................................................................... 16

    B.  Sufficiency of Unfair Competition Law Claims Against Specific Media ......... 17

        1.  Specific Media's Unfair Business Practices ............................... 17

        2.  Specific Media's Fraudulent Business Practices ....................... 18

        3.  Specific Media's Unlawful Business Practices .......................... 19

    C.  Sufficiency of Computer Crime Law Claims Against Specific Media ............. 19

    D.  Sufficiency of Invasion of Privacy Claims Against Specific Media ................. 21

    E.  Sufficiency of Trespass to Chattels Claims Against Specific Media ................. 21

    F.  Sufficiency of Unjust Enrichment Claims Against Specific Media ................. 23

    G.  Sufficiency of Plaintiffs' Claims Unaffected by Rule 9(b) .............. 25

V.   Conclusion ................................................................................................ 25

# I.  INTRODUCTION

This case is about Adobe Flash Local Stored Objects ("Flash LSOs or "LSOs")—little known files that can be stored on the hard drive of a user's computer and were improperly exploited by Specific Media as substitutes or back-ups for browser cookies to track consumers' Internet browsing activities. These LSOs were used by Specific Media to gain financial advantages through the deception of ignoring the preferences of consumers.

Several consolidated cases have been previously related to this matter on nearly identical facts, *Brian White et al. v. Clearspring Technologies, Inc. et al.*; *Erica Intzekostas v. Fox Entertainment Group, et al.*; *Davis v. Video Egg et al.,* each of which was part of a settlement that was presented and preliminarily approved by this Court. While not directly relevant to the Specific Media motion to dismiss, these cases do reflect on the credibility of Specific Media's motion in the context of, first, the independent research from the University of California, Berkeley, which formed the basis for many allegations and, second, the joint submission in the *Quantcast/Clearspring* matters, which sets forth a nonpartisan perspective as to the factual predicate for how Flash LSOs work and why these cases matter to the putative class. *See* Declaration of David Stampley, Exhibit A ("Joint Flash Cookie Overview") and Exhibit B ("Settlement Agreement").

While plaintiffs' counsel is unfortunately all too familiar with personal attacks on plaintiffs as a substitute for substance at the pleading stage of a litigation, in the present context, Specific Media's characterizations of the related matters as plaintiffs' "cash cow" and a "shake down" ignores reality and seems wholly disrespectful of the efforts made by this Court and all counsel in the related matters.

With a parade of straw men, Specific Media here seeks to avoid what is plain in the complaint—and in the pronouncements of Adobe (which markets Flash technology) and Specific Media's own industry counterparts and representatives: the misuses of Flash engaged in by Specific Media have been discredited and, by all reasonable players, disavowed and abandoned. Plaintiffs alleged Specific Media has gained illegal pecuniary

advantage by deceiving consumers and it must now answer for those actions. Just because the technology was sufficiently complex does not give Defendant the right to not accept the pleadings as true and to ignore basic rules on motions to dismiss with the same dismissiveness with which it treated class members when it deployed its Flash LSOs.

## II.  FACTUAL BACKGROUND

### A.  Parties

Defendant Specific Media is an online, third-party advertising network. (¶1).[1] Specific Media earns revenue by delivering targeted advertisements to hundreds of millions of consumers who visit web sites (often referred to as "publishers") in its network. (¶8). Specific Media pays publishers for "inventory," *i.e.*, advertising display space on web pages. In turn, advertisers pay Specific Media performance-based fees. (¶8).

Plaintiffs are all consumers who visited websites in Specific Media's ad network. (¶¶10, 23-25). Despite Plaintiffs' attempts to escape online tracking and profiling by third parties, Plaintiffs found Flash LSOs set by Specific Media on their computers. (¶¶21, 23, 26). Plaintiffs did not consent to or receive notice of Specific Media's installation of and use of such devices to track and profile them online, in circumvention of their browser settings. (¶¶22, 24).

### B.  Specific Media's Exploitation Campaign Using Flash LSOs

Online advertising companies became increasingly concerned about the precision and effectiveness of using HTTP cookies to track consumers because many privacy conscious consumers choose to block, or periodically delete HTTP cookies. (Dkt. 21, Exh. A at 1). This led to overestimation of the number of true unique visitors to websites, and attendant overpayment for advertising impressions. *Id*. Mindful of this problem, ad networks, such as Specific Media, have attempted to increase the reliability of tracking methods through the use of Flash LSO as a back-up ID system for cookies set by web sites, ad networks and advertisers, but increasingly deleted by users. *Id*.

---

[1]   All reference to paragraphs in Plaintiffs' First Amended, Consolidated Class Action Complaint are herein referred to as "¶____."

Opposition to Motion to Dismiss              2              Case No. 2:10-cv-01256-GW

Contrary to Defendant's assertions (Dkt. 21 at 7), the use of Flash LSOs to surreptitiously track consumers and override the browser privacy controls of users is not a widely accepted, legitimate business practice in the online community. Indeed, in a letter to the Federal Trade Commission, Adobe unequivocally condemned this practice. (¶20).

## III. PLAINTIFFS' HAVE STANDING

### A.  Standard for Review Article III Standing

"On a motion to dismiss pursuant to Rule 12(b)(1), the standards the court is to apply vary according to the nature of the jurisdictional challenge." *PNG Telecommunications, Inc. v. Pac-West Telecomm, Inc.*, 2010 WL 3186195, No. Civ S-10-1164 (FCD/EFB), at *2 (E.D.Cal. August 11, 2010). "A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of jurisdiction contained in the complaint as insufficient on their face to demonstrate the existence of jurisdiction (a "facial attack") or may be made as a "speaking motion" attacking the existence of subject matter jurisdiction in fact (a "factual attack")." *Id.* If the 12(b)(1) motion constitutes a facial attack, the court must consider the factual allegations of the complaint to be true. *Id.* If the motion constitutes a factual attack, however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

Specific Media's standing argument is limited to a facial attack on the sufficiency of plaintiffs' allegations with respect to "injury in fact." *See* (Dkt. 21, at 9-12) (outlining facts plaintiffs purportedly failed to allege regarding standing). Specific Media does not dispute any material jurisdictional facts in the Complaint and has not proffered any evidence outside of the pleadings with respect to such facts. Therefore, the Court should take the factual allegations of the Complaint as true when making its ruling.[2]

---

[2]  Specific Media mischaracterizes *Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983) by stating categorically that on a motion for standing, "no presumptive truthfulness attaches to plaintiff's allegations." (Dkt. 21at 9). That standard only applies to *factual* challenges to jurisdiction, not the facial challenge Specific Media advances here. *See PNG Telecommunications, Inc.*, 2010 WL 3186195 at *2-3.

**B.  Plaintiffs Have Article III Standing**

The case or controversy requirement, which constitutes "the irreducible constitutional minimum of standing," requires that a plaintiff show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Krottner v. Starbucks Corp.* 628 F.3d 1139, 1141 (9th Cir. 2010)

The case or controversy requirement, which constitutes "the irreducible constitutional minimum of standing," requires that a plaintiff show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Krottner v. Starbucks Corp.* 628 F.3d 1139, 1141 (9th Cir. 2010).

Plaintiffs sufficiently allege each element of standing. The Complaint alleges plaintiffs have personally suffered actual harm from the economic loss of wrongfully taken personal information and damage to their computers resulting directly from Specific Media's installation and use of Flash LSOs on their computers to track their online activities and build profiles on them without their knowledge and consent. (¶¶ 31, 55, 89, 96, 98, 104, 106).[3] For their injuries, Plaintiffs seek damages and injunctive relief.

Specific Media does not challenge the traceability and redressability requirements of standing; rather, its entire standing argument hinges on Plaintiffs' ability to establish an "injury in fact." (Dkt. 21 at 9-12). As explained below, Plaintiffs have incurred appreciable damages, and therefore, the harm they suffered is concrete, particularized and actual – not speculative or hypothetical as Defendants argue.

---

[3]   Contrary to Defendant's assertions (Dkt. 21 at 10), Plaintiffs do indeed allege that Specific Media installed LSOs to track their online activities and that they deleted Specific Media browser cookies. *See* (¶1,13-19,23) (Specific Media monitored and tracked Plaintiffs' online activities through LSOs); (¶21) (plaintiffs blocked and/or deleted third-party cookies (including those belonging to Specific Media).

### *1. Consumers' Use of their Personal Information for Economic Exchanges*

Plaintiffs alleged that Specific Media caused economic loss to Plaintiffs and Class Members by taking and retaining their personal information—surreptitiously, without permission, and for its own benefit—depriving Plaintiffs and Class Members of their information's economic value.

Internet business models are driven by consumers' willingness to supply data about themselves. Sandra J. Milberg & J. H. Smith, *et al*., *Information Privacy: Corp. Mgt. and Natl. Regulation*, 11:1 Organization Science at 35 (2000), *cited in Preparing For Privacy: A Module For Marketing Educators In An Era Of Electronic Commerce*, E. Vincent Carter, Oakland Univ., R. Goel, Howard Univ., Proceedings of the Annual Mtg. of the Assoc. of Collegiate Marketing Educators at 38 (2005). Consumers engage in economic exchanges, providing their personal information in exchange for receiving ostensibly free online content and services and thereby reducing the cost they would otherwise have to pay. Thos. M. Lenard & Paul H. Rubin, *In Defense of Data: Information and the Costs of Privacy*, Tech. Policy Inst. May 2009 at 2, http://www.ftc.gov/os/comments/-privacyroundtable/544506-00011.pdf (submitted as a comment to FTC). Even in such transactions that do not involve personally identifiable information, but merely *personal* information with which consumers are tracked anonymously by advertisers, consumers engage in value-for-value exchanges by providing their information in exchange for ad-supported content on websites. *See* Steve Sullivan, *Do-Not-Track: A Bigger Threat*, The Hill's Congress Blog*, Dec. 2, 2010, http://thehill.com/blogs/congress-blog/technology/-131613-do-not-track-a-bigger-threat (consumers obtain online content by providing their "non-personally identifiable information" in a value exchange with web publishers).

Where a web publisher's offer of content or services is supported by advertising revenue, the consumer becomes a participant in a two-sided business platform with the web publisher functioning as an intermediary between two sets of customers: consumers who provide personal information and advertisers who pay the publisher for access to consumers' information. David S. Evans, *The Online Advertising Industry: Economics,*

*Evolution, and Privacy*, 23 J. Econ. Perspectives 3, p. 37. The "free" content offered by the publisher is an inducement that increases consumer traffic on the publisher's site, which, in turn, the publisher parlays into increased advertising revenue. David S. Evans, "Two-Sided Markets," *Issues in Competition Law & Policy*, Vol. II, Chapt. 28, ABA (2008), citing David S. Evans & R. Schmalensee, *The Industrial Organization of Markets with Two-Sided Platforms*, 3 Competition Policy Intl. 1, Spr. 2007 at 155-56.

Two industry organizations to which Defendant belongs acknowledge the value exchange between consumers and providers of online content and services. The Interactive Advertising Bureau (IAB) recently observed that without consumers' data, "consumers would encounter a severely diminished experience since they would lose out on the remarkable benefits provided by data sharing. *IAB Reviews Preliminary FTC Staff Report on Protecting Consumer Privacy,* Dec. 1, 2010, http://www.iab.net/public_policy/-1481209. Similarly, the Network Advertising Initiative (NAI) stated, "Instead of requiring visitors to register and pay a subscription fee, the operators of Web content and services subsidize their offerings with various types of advertising." The NAI noted that behaviorally targeted ads rely on personal information furnished by consumers such as "registration information reflecting [consumers'] gender, age, or zip code; or alternatively, other potential interests of [consumers] inferred from prior Web activity, either on the publisher's site or elsewhere on the web." Comment, Network Advertising Initiative, FTC Privacy Roundtables, Proj. No. P09541, Comment No. 544506-00019, Nov. 6, 2009 at 2-3, http://www.ftc.gov/os/comments/privacyroundtable/index.shtm. Thus, Defendant's Media's own industry spokespersons have acknowledge hat consumers get value online because they give value, in the form of their online information.

Even when consumers receiving web content and services are subjected to more information collection than they realize or their information in used in ways they did not expect, the for-value exchange entered into by consumers imposes opportunity costs on them. In such transactions, consumers suffer the loss of the opportunity to have entered into value-for-value exchanges with other web publishers and third-party advertisers

whose business practices better conform to consumers' expectations. *See In re Toys R Us, Inc., Privacy Litig.*, 00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) (refusing to recognize lack of damages as basis for motion to dismiss and recognizing plaintiffs might have been able to sell their information to another marketing firm); *see also*, *Meyer v. Sprint Spectrum, L.P.*, 200 P.3d 295, 299, 45 Cal.4th 634, 640 (2009) (in Consumer Legal Remedies Act claim, opportunity costs may constitute damages for purposes of standing). As stated by Thomas M. Lenard, president of the Technology Policy Institute:

> Since the online marketplace is quite competitive, with many participants, we would expect that any particular consumer's preferences for privacy would be satisfied by one or another of the sellers. If the preferences of a significant group of consumers were not being satisfied and could be met at a cost they were willing pay, it would be in the interest of some firms to satisfy those preferences.

Lenard & Rubin, "In Defense of Data" at 50. Thus, economists aligned with the advertising industry acknowledge that consumers have a choice in where they will engage in value-for-value exchanges with their information.

Not only do consumers recognize economic value in their personal information when they use it to acquire online content and services or choose among providers, they recognize its economic value when they choose to withhold their information and decline to proffer their information in an exchange for value. In that sense, consumers make economic decisions when they withhold their information and forego online offerings. *See* Lenard & Rubin, "In Defense of Data" at 6 ("there is a tradeoff between the benefits of increased privacy and the benefits of increased information in the marketplace"). Consumers exercise such choices by electing which websites to visit or by setting browser filters that affect how websites can set browser cookies on their computers; these, too, are decisions predicated on their recognition and use of the value of their information. *See* Evans, "Online Advertising Industry" at 56-57 ("[t]o the extent that the consumers exercise these choices they put competitive pressure on online advertisers to account for the value that consumers place on data about themselves"); *see also* Lenard & Rubin, "In

Defense of Data" at 3 ("more privacy implies less information available for producing benefits for consumers"); *id.* at 8 (firms and consumers make cost-benefit calculations).[4]

### 2. *Valuation of Personal Information*

Personal data has been referred to as "the new 'oil'—a valuable resource of the 21st century." *Personal Data: The Emergence of a New Asset Class*, World Economic Forum, p. 5, http://www.scribd.com/doc/48942096/Personal-Data-The-Emergence-of-a-New-Asset-Class. There is value in direct and inferred personal data acquired through mining of the online actions of consumers. World Economic Forum, p. 23. "Particular-ized information" is a commodity that can be sold in the marketplace. Richard S. Murphy, *Property Rights in Personal Information: An Economic Defense of Privacy*, 84 *Geo. L.J.* 2381, 2402 (1996).

Specific Media claims Plaintiffs and the Class have no economic interest in their own data and that their data lacks discernable value. Citing to a different case with different facts, Defendant blithely suggests that consumers cannot economically value their own attention. (Dkt 21 at 11-12.) But this is not a case about counting eyeballs. It is a case about data—data that has value, data that is bought and sold in the marketplace.

That marketplace includes opportunities for market their information directly to advertisers and other commercial entities, with services such as allow.com (UK) ("[p]ersonal information like your name and address is being traded for profit everyday. Now you can help stop this trade and turn your data into cash for yourself with AL-LOW's new, free service"); personal.com ("[o]wn, manage, and share your personal in-

---

[4] In addition, consumers may make the economic decision to withhold their information and/or forego online transactions because they do not want a merchant or advertiser to collect their personal information, only to find it used against them in discriminatory pricing. *See*, Lenard & Rubin, "In Defense of Data' at 30-31 ("We speculate that over-all the availability of online data makes discrimination easier, not more difficult."). Re-gardless of the degree of pervasiveness of discriminatory pricing or the extent to which the consumer population withholds information to avoid such practices, the very fact that it can occur and has occurred demonstrates the economic interest consumers have in online information about themselves.

formation"); and www. selectout.org. *See, generally*, *The Personal Data Ecosystem Collaborative Consortium Blog*, http://personaldataecosystem.org/category/blog.

Defendant gratuitously ignores Plaintiffs' allegations that Specific Media took information from them, that Specific Media had no right to take, that Specific Media had been told not to take, and that Specific Media took surreptitiously, using methods designed to circumvent Plaintiffs' privacy controls. This information was valuable enough to Defendant that it blatantly disregarded Plaintiffs' wishes.

Specific Media's position is that consumers lose nothing of value as a result of Specific Media's recurring taking and using their information. But it is *because* the information is valuable that consumers protect it, and it is because the information is valuable to consumers that Specific Media had to stoop to sneaking past consumers' privacy controls to take the information. Specific Media is well aware that consumers' information has discernable, because Specific Media is in that market every moment of the day. Specific Media knows what it pays publishers to track their visitors and it knows what advertisers pay Specific Media to make use of the consumer profiles it has amassed. Defendant's own business model proves Plaintiffs' standing.

### 3. *Damage to Computers*

Plaintiffs have also suffered harm to their property, *i.e.*, their personal computers, because Specific Media's installation of Flash LSOs circumvented and diminished the performance and capabilities of the their computers. Plaintiffs purchased computers equipped with browsing software and Internet connectivity hardware. The browsers on their computers included privacy and security control features that allowed Plaintiffs to manage third-party tracking by permitting, restricting, or deleting third-party browser cookies on Plaintiffs' computers. In addition, Plaintiffs paid for connectivity services so they could use their computers to access the Internet, with expectations of certain levels of service from their Internet service providers.

Specific Media was aware that browsers have such cookie-filtering capabilities, and it was precisely because consumers exercise those capabilities that Specific Media

1   sought to render them useless. By installing and using Flash LSOs, Specific Media pur-
2   posefully circumvented the utility of consumers' browser privacy security controls, im-
3   pairing their functioning and diminishing their value. In the process, Specific Media di-
4   minished the speed on Plaintiffs' Internet connections and caused websites in Specific
5   Media's ad network to load at a slower rate than other web sites. Inasmuch as load times
6   are routinely tracked by online metrics services, Specific Media was aware of this effect,
7   also. Consumers, on the other hand, remained unaware of Specific Media's use of LSOs
8   and the attendant effect on their Internet browsing performance, which is exactly how
9   Specific Media wanted it to stay. (See ¶55, 96, 98).

10          Defendant's reliance on the non-binding case of *In Re DoubleClick Privacy Litiga-*
11  *tion,* 154 F. Supp. 2d 497 (S.D.N.Y. 2001) is misplaced.[5] (Dkt. 21 at 11-12). The *Dou-*
12  *bleClick* court did not analyze the issue of standing. In *DoubleClick*, the plaintiffs' claim
13  under the CFAA was dismissed because the plaintiffs failed adequately to allege damages
14  or economic loss under claims of injury materially different from those set forth in this
15  case and which the court found were avoidable. In addition, the court, drawing certain
16  analogies between online and offline advertising,[6] rejected plaintiffs' arguments that they
17  suffered economic damages consisting of the economic value of their attention to Dou-
18  bleClick's advertisements and the value of the demographic information compiled by it
19  through the use of browser cookies. *Id.*

---

20  [5]  Defendant's citations to *Johnson v. Weinberger*, 851 F.2d 233 (9th Cir. 1988); *Space*
21  *Exploration Techs. Corp. v. Boeing Co.*, 2006 U.S. Dist. LEXIS 96389 (C.D. Cal. May
    11, 2006); *Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 2010 U.S. Dist. LEXIS 31825
22  (S.D.Cal. Apr. 1, 2010); and *Lee v. Capital One Bank*, 2008 U.S. Dist. LEXIS 17113
23  (N.D.Cal. Mar. 5, 2008) (Dkt. 21 at 10-11) are unavailing because in each of those
    cases, the court found that the harm suffered by the plaintiff was too speculative or hy-
24  pothetical to confer standing. As explained above, the harm alleged by Plaintiffs here is
25  concrete and actual or imminent.
26  [6]  At any rate, the DoubleClick court's analogy between offline and online advertising
    fails because in the online context, advertisers count viewers by tracking them and col-
27  lecting their personal information. This is not the case in the offline context. *See* Evans,
    "Online Advertising Industry" at 42 (comparing online, which includes tracking com-
28  ponent, and offline advertising).

---

In contrast, here, Plaintiffs expressly sought to prevent Specific Media from collecting their personal information by configuring their web browsers to automatically block cookies and/or by deleting cookies from third parties like Specific Media. Plaintiffs further alleged that Specific Media employed Flash LSOs with the intent to circumvent Plaintiffs' expressed cookie controls. In addition, Plaintiffs in the instant case do not seek the "economic value of their attention" to Specific Media's advertisements, as did the DoubleClick plaintiffs. Rather, Plaintiffs here allege that they have been deprived of the value of their personal data (not mere demographic information) that was taken by Specific Media without their consent and that such information has a discernable value to them, to Specific Media and its clients.

Finally, Defendants' argument that Plaintiffs lack standing because they failed to allege the re-spawning of previously deleted browser cookies is unavailing. (Dkt. 21 at 10). First, it is Specific Media's improper use of LSOs that affected all class members, and re-spawning (confirmed by the Berkeley Study) is but one manifestation of Specific Media's use of LSOs. Further, the Ninth Circuit has held that the possibility of future injury may be sufficient to confer standing on plaintiffs." *Krottner v. Starbucks Corp*. 628 F.3d 1139, 1142 (9th. Cir. 2010) (agreeing "…with those circuits that have recognized that a credible threat of harm is sufficient to constitute actual injury for standing purposes, whether or not a statutory violation has occurred"). Accordingly, the threat that Plaintiffs' previously deleted cookies will be re-spawned when they visit websites in the Specific Media's network is a real threat of imminent harm sufficient to satisfy the "injury in fact" requirement of standing.

## C.  Plaintiffs' Standing Under the California Unfair Competition Law

The UCL confers standing on a person who has suffered injury in fact and has lost money or property as a result of such a violation. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 319, 2011 WL 24078, at *6 (2011). As explained recently by the California Supreme Court, the term lost money or property is essentially synonymous with "economic injury." *Id*. The California Supreme Court also made clear that this hurdle is not a tall

one. *See id.* ("[W]e may infer from the text of Proposition 64 that the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact; if more were needed, the drafters could and would have so specified."). *Id. at* \*7. Such injury need only be "non-trivial."[7] *Id.*

There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. *Id.* Contrary to Defendant's assertions (Dkt. 21 at 12-13), Plaintiffs do, in fact, allege that they have lost "money or property"[8] *See also*, ¶¶ 14, 17, 21 & 31 (*inter alia*, Plaintiffs allege that their computers are being manipulated without their knowledge, files are being impermissibly placed on their computers, in a place no one would know to look for them, those files are then being used to track Plaintiffs' movements across multiple websites so that detailed profiles can be assembled of Plaintiffs' confidential internet viewing and buying habits.) All of this is done so that Defendants can profit at the expense of Plaintiffs' privacy.[9] These factual allegations estab-

---

[7] *Id.* ("federal courts have reiterated that injury in fact is not a substantial or insurmountable hurdle; as then Judge Alito put it: "Injury-in-fact is not Mount Everest." (*Danvers Motor Co., Inc. v. Ford Motor Co.*, *supra*, 432 F.3d at p. 294.) Rather, it suffices for federal standing purposes to " 'allege[ ] some specific, "identifiable trifle" of injury.')("If a party has alleged or proven a personal, individualized loss of money or property *in any nontrivial amount*, he or she has also alleged or proven injury in fact") (*emphasis* added).

[8] *See* ¶ 31 ("Defendant's conduct has caused economic loss to Plaintiffs and Class Members in that their personal information has discernable value, both to Defendant and to Plaintiffs and Class Members, and of which Defendant has deprived Plaintiffs and Class Members and, in addition, retained and used for its own economic benefit."); ¶ 86 ("Plaintiffs and the Class have suffered injury-in-fact and have lost money and/or property—specifically, personal information and the full value of their computers.").

[9] *See* ¶90 ("Defendant's business acts and practices are unfair because they cause harm and injury-in-fact to Plaintiffs and Class Members and for which Defendant has no jus-

---

lish standing to assert UCL claims. *Cf.* See *Doe 1 v AOL LLC*, 719 F. Supp. 2d 1102, 1113-14 (N.D. Cal. 2010) (injury from AOL's public disclosure of confidential member information conferred standing in UCL claims).

Finally, because Plaintiffs have shown that they personally have standing to bring their each of their causes of action, they may seek relief on behalf of the class.[10]

## IV. PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR CLAIMS

Dismissals under to Rule 12(b)(6) should be granted only in "extraordinary" cases. *United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981). When considering a motion to dismiss, the allegations contained in the complaint must be accepted as true and construed in the light most favorable to the plaintiff. *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2003). The Court must draw all reasonable inferences from those allegations in Plaintiffs' favor. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A Complaint need only state "enough facts to state a claim to relief that is plausible on its face." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Finally, if a dismissal is granted under Rule 12(b)(6), leave to amend should be ordered unless "the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (citations omitted).

---

tification other than to increase, beyond what Defendant would have otherwise realized, its profit in fees from advertisers and its information assets through the acquisition of consumers' personal information.").

[10] *Leong v. Square Enix of America Holdings, Inc*., No. CV 09-4484 PSG, 2010 WL 1641364 (C.D.Cal. April 20, 2010) (C.D.Cal.,2010) Dkt. 21. at 10) is inapposite. *Leong* involved a slew of factual issues where plaintiff were atypical of the class members, such as, having purchased the product at issue in the litigation to investigate her claims against defendants with no intention of playing the game again. *Id.* at *4. Here, Plaintiffs have shown that they have standing to bring each of their claims and suffered the same injuries as did the class.

---

## A. Sufficiency of Computer Fraud and Abuse Act Claims Against Specific Media

The CFAA prohibits any person from intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtaining information from any protected computer. 18 U.S.C. § 1030(a)(2)(C). The CFAA also prohibits any person from (i) knowingly causing the transmission of a program, information, code or command, and as a result of such conduct, intentionally causing damage without authorization, to a protected computer, or (ii) intentionally accessing a protected computer without authorization, and as a result of such conduct, recklessly causing damage. 18 U.S.C. §§ 1030(a)(5)(A) & (B).

As discussed below, Plaintiffs sufficiently allege that Specific Media's conduct of installing LSOs on the computers of Plaintiffs and the Class to track their Internet activities without their knowledge and consent violated each of these CFAA provisions.

### 1. *Transmission of a Program, Information, Code or Command*

By depositing Flash LSOs on Plaintiff's computers, Specific Media caused the "transmission of a program, information, code or command on a protected computer."

### 2. *Damage or Loss*

The CFAA authorizes any person who suffers "damage or loss" by reason of a violation of the above provisions of the CFAA to maintain a cause of action against the violator. 8 U.S.C. § 1030(g). Such damages are limited to "economic damages." *Id*. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a system, *or* information." 18 U.S.C. § 1030(e)(8) (emphasis added). The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service" 18 U.S.C. § 1030(e)(11). Plaintiffs must claim economic loss or damages in an amount "aggregating at least $5,000 in value during any 1-year period to one or more individuals." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

Here, Plaintiffs meet these requirements. As discussed in Section III.B, *supra*, Plaintiffs suffered distinct harms as a result of Specific Media's (1) economic damages to their computers in that Specific Media's conduct circumvented their privacy and security controls and diminished their computers' performance and capabilities and (2) economic loss in that they were deprived of the economic value of their personal information which has a discernable economic value to them and to Specific Media and its clients. (¶55).

Courts have found these types of allegations of harm sufficient to state a claim under the CFAA. *See e.g., In re Toys R Us, Inc., Privacy Litig.*, 00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ) (court held that the plaintiffs had adequately alleged loss under the CFAA where the plaintiff alleged that loss entailed the misappropriation of the economic value of plaintiffs' and class members' personality because the personal information obtained by defendants could be sold to market researchers for plaintiffs' financial gain); *Therapeutic Research Faculty v. NBTY*, 488 F. Supp. 2d 991 (E.D. Cal. January 25, 2007) (court held that the plaintiffs had adequately alleged loss under the CFAA where the plaintiff alleged that loss entailed the authorized use of password and thereby obtained additional access to licensed materials).

As alleged in the Complaint, defendants' conduct in setting LSOs on the computers of plaintiffs and putative class members was an automated process instigated by defendant in a campaign that constituted a single act and when the plaintiffs' and putative class members' claims are aggregated, the $5,000 threshold is easily met. (¶ 54-55); *see In re Apple & ATTM Antitrust Litig.,* No C07-05152 JW, 596 F. Supp. 2d 1288 (N.D. Cal. October 1, 201 (citing *In re Toys R Us, Inc. Privacy Litigation,* 2001 WL 34517252, *11 (N.D.Cal.2001) (class of plaintiffs permitted to aggregate damages to their individual computers where it was alleged that the defendants caused an identical file to be implanted in each of the plaintiffs' computers, resulting in damages of a uniform nature)[11]; *see also In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1374 (S.D. Fla. 2001);

---

[11] The *Toys R Us* court found the legislative history of the CFAA revealed that Con-

1   *Mortensen v. Bresnan Communication*, L.L.C., No. CV 10-13-BLG-RFC, 2010 WL
2   5140454, at *7 (D. Mont. Dec. 13, 2010)(defendant's installation and distribution of a
3   special purpose server on their computers was a single act resulting in damages to
4   plaintiffs and class members and "when aggregated across one or more individuals" such
5   damages were sufficient to survive a dismissal motion)

6       ***3.  Authorization***

7       Plaintiffs' Complaint is replete with allegations that Specific Media accessed the
8   Plaintiffs' and putative class members' computers without authorization, or exceeding
9   authorization, by installing LSOs to circumvent consumers' web browsers' security and
10  privacy controls with respect to third-party cookies. *See* (¶¶ 1, 14, 17, 21-23) Defendant
11  did not give notice or obtain consent to override Plaintiffs' browser privacy controls and
12  security controls designed to detect unwanted third party cookies. *See America Online,*
13  *Inc. v. LCGM, Inc.,* 46 F. Supp. 2d at 451 (court granted summary judgment in favor of
14  plaintiffs on a CFAA claim where undisputed facts showed that the defendant used
15  special software to evade AOL's spam-filtering mechanisms and forged e-mail headers to
16  escape detection by individual AOL members' blocking filters and e-mail control
17  settings); *Mortensen*, 2010 WL 5140454, at *8 (court held that for purposes of a 12(b)(6)
18  motion, plaintiffs sufficiently alleged that defendant's act of tampering with the security
19  and privacy protocols exceeded any authorization that plaintiffs may have given by
20  installing a special purpose server on plaintiff's computers).

21      Defendant plainly exceeded any purported authorization it once had. *See* 18 U.S.C.§
22  1030(e)(6)(defining "exceeds authorized access" under the CFAA as "access a computer
23  with authorization and to use such access to obtain or alter information in the computer
24  that the accesser is not entitled to so obtain or alter.") The authority cited by Defendant is
25  thus distinguishable.

26      Unlike the defendants in *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, (D.

27
28  gress intended to permit aggregation of damages so long as those damages arose from a
    defendant's uniform conduct leading to uniform results. *Id.* at *11.

Ariz. 2008) and *Creative Computing v. Getloaded.com*, 386 F.3d 930 (9th Cir, 2004)
(Dkt. 21 at 17), Specific Media was not an employee exceeding access to Plaintiffs'
computers. Specific Media is more akin to an outside, malicious hacker surreptitiously
installing code on Plaintiffs' computers. In any event, Creative Computing, a ruling on a
post-trial motion, is not instructive here on the adequacy of plaintiffs' CFAA allegations.

**B.  Sufficiency of Unfair Competition Law Claims Against Specific Media**

### 1. *Specific Media's Unfair Business Practices*

Plaintiffs also adequately plead that Defendants' actions constitute an unfair busi-
ness practice. "[A]n 'unfair' business practice occurs when it offends an established pub-
lic policy *or* when the practice is immoral, unethical, oppressive, unscrupulous or sub-
stantially injurious to consumers." *People v. Casa Blanca Convalescent Homes Inc*., 159
Cal. App. 3d 509, 206 Cal. Rptr. 164, 177 (1984)(*emphasis* added). Contrary to Defen-
dant's argument, "California courts have long applied a balancing test. Under that test,
'the determination of whether a particular business practice is unfair necessarily involves
an examination of its impact on its alleged victim, balanced against the reasons, justifica-
tions and motives of the alleged wrongdoer. In brief, the court . . . weigh[s] the utility of
the defendant's conduct against the gravity of the harm to the alleged victims.'" *Spiegler
v. Home Depot U.S.A., Inc.,* 552 F. Supp. 2d 1036, 1045 (C.D. Cal. 2008) aff'd sub nom.
*Spiegler v. Home Depot USA, Inc*., 349 F. App'x. 174 (9th Cir. 2009).[12]

Under that balancing, Plaintiffs clearly state sufficient facts to defeat a motion for
dismissal under Rule 12(b)(6). Plaintiffs allege that Defendant has engaged in a scheme
to systematically thwart Plaintiffs' wishes regarding the tracking of their online behavior,
and undermine Plaintiffs' privacy protections. Plaintiffs have alleged that Defendant
places secret tracking files on their computers in a place where those tracking files are un-

---

[12] Defendant incorrectly asserts that Plaintiff must demonstrate the violation of a legis-
latively declared policy or proof of some actual or threatened impact on competition.
That standard is to be applied only when a *competitor* sues under the UCL. For con-
*sumer* claims, the Ninth Circuit has recognized that a Court should utilize the traditional
balancing test outlined above.

likely to be found. The files cannot be deleted by Plaintiffs' Internet browser and the files are used to "respawn" cookie previously deleted by Plaintiffs. Defendant does not disclose this practice to Plaintiffs in any way. This information Defendant tracks is of a type that Plaintiffs consider to be confidential, and is information that Plaintiffs took care to protect from disclosure to Defendant. Yet Defendant engaged in this conduct specifically for the purpose of thwarting those efforts by Plaintiffs.

These are serious harms to Plaintiffs, and under California's traditional balancing test for unfair competition claims, these actions are not only contrary to established public policy but also constitute practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. For these reasons, Plaintiffs respectfully submit that dismissal of these claims at the pleading stage would be improper.

### 2. *Specific Media's Fraudulent Business Practices*

The UCL's primary focus is "on the defendant's conduct rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ("*Tobacco II*") (citations omitted). ). The UCL is "sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law." *Cel-Tech Communs., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th at 180; *see also In re First Alliance Mortgage Co.*, 471 F.3d 977, 995-96 (9th Cir. 2006).

Contrary to Defendant's assertions, Plaintiffs quite specifically plead the circumstances of Defendant's fraudulent business practices. Throughout the Complaint, Plaintiffs outline how Defendants accomplish their scheme and specifically plead that "Defendant knew or should have known that consumers care about the status of personal information and its privacy but were unlikely to be aware of the manner in which Defendant willfully evaded their expressed privacy controls and browser settings." *See* Complaint ¶ 91. Plaintiffs also plead that "Defendant's acts and practices were fraudulent within the meaning of the UCL because they are likely to mislead the members of the public to whom they were directed." *See* Complaint ¶ 91.

---

Fraudulent business practices can also be established when a Defendant, as in this case, has a duty to disclose, and does not. *Massachusetts Mutual Ins. Co. v. Sup. Ct.*, 97 Cal. App. 4th 1282, 1292-94 (2002) (claim under UCL and CLRA can be based on material omissions). In this case, Plaintiffs are quite clear that Defendant had a duty to disclose its placement of LSOs on Plaintiffs' computers and how it would subsequently use those files. Plaintiffs are also quite clear in their description of how they were deceived by Defendants' failure to do so. Plaintiffs adequately plead this basis of their claim. For this reason, Defendants' Motion should be denied.

### 3.  *Specific Media's Unlawful Business Practices*

As discussed below, Plaintiffs adequately pled claims under the CFAA and California's Computer Crime Law and Invasion of Privacy Statute. *See infra*, Sections IV.AIV.CC, and D. For the reasons stated in those sections, those statutory violations provide the requisite unlawful activity to support an Unlawful Business Practices claim. Defendant's Motion, premised on an assertion that its activities were lawful, should be denied as to this ground as well.

## C.  Sufficiency of Computer Crime Law Claims Against Specific Media

Defendant presents three challenges to Plaintiffs' claims under California's Computer Crime Law ("CCCL"). First, the CCCL, however, is not nearly as limited as Defendant would have the Court believe. Cal. Penal Code § 502(c)(4) creates liability against one who knowingly accesses and without permission *adds[][or] alters* . . . any data." (emphasis added). The CCCL also provides liability for anyone who knowingly and without permission "uses or causes to be used computer services" Cal. Penal Code § 502(c)(3) "Computer services" is a defined term and includes, but is not limited to, computer time, data processing, or storage functions, or other uses of a computer. Liability is also imposed for anyone who knowingly accesses, and without permission takes, copies, or makes use of any data from a computer." Cal. Penal Code § 502(c)(2). Defendant has impermissibly added data to Plaintiffs computers, impermissibly used the storage functions on those computers, and altered the data on Plaintiff's computer to track Plaintiffs.

1  Defendant has further used its LSO files to recreate browser cookies Plaintiffs had de-

2  leted. These actions clearly support claims under the CCCL.

3      Defendant next claims that Plaintiffs fail to assert that they have been harmed by

4  Defendant's actions. Plaintiffs will rely on and here incorporate their arguments on this

5  issue discussed in the context of other causes of action. One citation, however, is worthy

6  of note in this context. "Injury" as defined by the act encompasses "any alteration of a

7  computer system [which by definition under the CCCL is one device]. . . or data caused

8  by the access." Cal. Penal Code § 502(b)(8). Thus, in addition to the harm outlined

9  above, Defendant, by placing LSOs on Plaintiffs' computers without permission, altered

10  Plaintiffs' computers and the data contained thereon. This constitutes sufficient loss un-

11  der the CCCL for Plaintiffs' cause of action.

12      Finally, Defendant claims Plaintiffs do not allege that Defendants' actions were

13  committed "without permission." There is little doubt that Plaintiffs' allege that Defen-

14  dants did not have their permission to engage in the actions described in Plaintiffs' Com-

15  plaint. *See* Complaint ¶ 22 ("None of the Plaintiffs have given any consent or received

16  any notice regarding Specific Media's use of devices other than third-party cookies to

17  engage in or to approximate cookie-like tracking and profiling activities.").

18      Contrary to the single case relied upon by Defendant, *Swearington v. Haas Auto-*

19  *mation, Inc.,* 2009 U.S. Dist. LEXIS 106754 (S.D. Cal. Nov. 12, 2009) (plaintiff failed to

20  ever allege that the defendant acted without permission), here Plaintiffs clearly allege that

21  Defendant did not have their permission. Alternatively, Plaintiffs also allege that Defen-

22  dant exceeded any permission Plaintiffs may have given. *See Facebook, Inc. v. ConnectU*

23  *LLC,* 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007)(recognizing computer owners are

24  "free to set the conditions on which they will grant such permission" and that violation of

25  those conditions constitutes violation of the Act). This is sufficient to demonstrate viola-

26  tion of the CCCL.[13]

27  _____

28  [13] The fact that Defendant claims it may have had permission, while possibly relevant to

_____

**D.  Sufficiency of Invasion of Privacy Claims Against Specific Media**

California Penal Code § 631 specifically provides for the liability of "[a]ny person who . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." California Penal Code § 631. This broad prohibition clearly includes Plaintiffs' electronic communications with websites.

Ignoring the fact that Plaintiffs pled claims under § 631, Defendant disingenuously focuses its arguments on California Penal Code § 632, which proscribes the interception of *confidential* communications only. No such limiting language is contained in section 631, the statute explicitly relied upon by Plaintiffs in their Complaint. As outlined above, Plaintiffs plainly allege that Defendant is impermissibly placing files on their computers for the purpose of monitoring their communication with websites. Defendant did not have Plaintiff's consent to do so. This constitutes a violation of the Act. Therefore, Defendant's Motion should be denied as to this Count.[14]

**E.  Sufficiency of Trespass to Chattels Claims Against Specific Media**

To state a claim for the common-law tort trespass to chattels, the plaintiff must establish that "(1) defendant intentionally and without authorization interfered with plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately resulted in damage to plaintiff." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp. 2d 1058, 1069-1070 (N.D. Cal. 2000). California has recognized that a plaintiff may also maintain an action if the authorization exceeded plaintiff's consent. *Coupons, Inc. v. Stottlemire*, No. CV 07-03457 HRL, 2008 WL 3245006 at *6 (N.D. Cal. 2008).

---

a summary judgment motion, is not properly due consideration in a motion to dismiss. Plaintiffs respectfully request that Defendant's Motion be denied.

[14] Unlike the cases cited by Defendant, Plaintiffs have sufficiently pled that they had an expectation of privacy in their communications.

Plaintiffs have pled that Defendant intentionally interfered with Plaintiffs' possessory interests in their computer, either without authorization, or exceeding any possible authorization. (¶¶95-101). Plaintiffs in this case assert that Defendant caused the installation of code on the hard drives of computers, causing damage and impairing the ability of the Plaintiffs to control the function of their own computers. (¶98). Such actions impaired the condition, quality and value of those computers. The Defendant prevented Plaintiffs, who chose to control the privacy and security of their computers, from doing so. *See*, Rest.2d Torts, § 218, paras. (b), (c)(intermeddling is actionable where the property is impaired as to its condition, quality or value.)

Similarly, Defendant's claim that its actions were authorized is without merit. Even assuming that Plaintiffs authorized Defendant's installation of browser cookies on their computers, such authorization was limited to browser cookies that improve the system, which cannot be said for the LSO tracking code surreptitiously deposited by Defendant. (¶99). *See In re Apple & AT&T Antitrust Litig.*, 596 F.Supp 2d 12.88, 1307 (N.D. Cal. 2008).

Plaintiffs have also sufficiently pled damages as a result of Defendant's conduct. *See* Am. Consol. Complt ¶¶ 102-104. Plaintiffs also specifically allege that the actions of Defendant compromised the integrity and security of their computers, something that clearly decreases the computers' value, especially in a secondary market. *Id.* Moreover, Plaintiffs were prevented from using that portion of Adobe that included the unauthorized code implanted by Defendant. *See eBay*, 100 F.Supp. 2d at 1071 (holding that even if defendant only used a small amount of eBay's computer system capacity, eBay was deprived of the ability to use that portion). In addition, as with *eBay*, if every ad server was permitted to put Flash LSOs onto the Plaintiffs' computers, it could potentially cause more substantial impairment of the computers. *eBay*, 100 F.Supp. 2d at 1072.[15]

---

[15] *Ticketmaster Corp. v. Tickets.com, Inc.*, No. CV 99765 HLH, 2003 WL 21406289 (C.D. Cal.) (Dkt. 21 25) is inapposite. The instant case does not involve a public, commercial website, but rather the personal computers of individuals, who were dispossessed of their right to control the security of their computers.

This case alleges harm that resulted Defendant's placement and use of a specific type of file on the hard drives of Plaintiffs' computers and with which Defendant intentionally interfered with Plaintiffs' control over the privacy and security of their systems. Defendant used Plaintiffs' property—their computers—to gather information about Plaintiffs for Defendant's commercial benefit. Specific Media unjustly enriched itself at Plaintiffs' expense, using Plaintiffs' property and information, and did so in spite of Plaintiffs' "no trespassing" instructions. Defendant should not be permitted to profit from improper use of Plaintiffs' property.[16]

**F.  Sufficiency of Unjust Enrichment Claims Against Specific Media**

Contrary to Defendants assertions (Dkt. 21 25), various courts in the state of California recognize unjust enrichment as a viable cause of action. *See, e.g.,FDIC v. Dintino*, 167 Cal. App. 4th 333, 346, 354 (Cal. Ct. App. 2008) (recognizing the plaintiff's unjust enrichment claim); *Hirch v. Bank of Am.*, 107 Cal. App. 4th 708, 722 (Cal. Ct. App. 2003) (valid cause of action for unjust enrichment based on bank's unjustified charging and retention of excessive fees); *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 724-25 (Cal. Ct. App. 2000); *Villager Franchise Sys. v. Dhami, Dhami & Virk*, CV-F-04-6393, 2006 WL 224425, 2006 U.S. Dist. LEXIS 6114 (E.D.Cal.2006) ("California law recognizes a cause of action for unjust enrichment"); *Gerlinger v. Amazon.Com, Inc*., 311 F.Supp.2d 838, 856 (N.D.Cal.2004) (Patel, J.) ("[u]nder California law, unjust enrichment is an action in quasi-contract"); *Western Pac. R. Corp. v. Western Pac. R. Co*., 206 F.2d 495, 498 (9th Cir.1953) ("it is of course true that the California courts, in common with authorities generally, recognize a cause of action based on unjust enrichment").

Though some courts that have held that there is no *independent* cause of action for unjust enrichment, these courts nevertheless treat allegations for unjust enrichment as a cause of action for restitution. *See Nordberg v. Trilegiant Corp*., 445 F. Supp. 2d 1082,

---

[16] *Intel Corp. v. Hamidi*, 30 Cal.4th 1342 (2003) (Dkt. 21 at 23-25) is factually distinguishable as it did not involve a claim that the plaintiffs' personal property was used to gather information about the plaintiffs and to benefit defendants commercially, as is alleged in the instant action.

1100 (N.D. Cal. 2006)("[F]or the most part, courts finding that California does not allow an 'unjust enrichment' cause of action have made essentially semantic arguments-focusing on the interrelationship between the legal doctrine of unjust enrichment and the legal remedy of restitution. . . . the courts found that although labeled "unjust enrichment," the causes of action could be understood as claims for restitution.").

"Unjust enrichment" and "restitution" have similar meanings in the eyes of many courts. *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996) ("an individual may be required to make restitution if he is unjustly enriched at the expense of another. But unjust enrichment sometimes calls for a broader remedy. *See County of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 541-44, 69 Cal. Rptr. 3d 848, 855-57 (Cal. Ct. App. 2007)("The principle of unjust enrichment, however, is broader than mere "restoration" of what the plaintiff lost."). As explained by the Court in *Walsh*:

> [T]he public policy of this state does not permit one to "take advantage of his own wrong" regardless of whether the other party suffers actual damage. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 741-742, 336 P.2d 534.) Where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust . . . [t]he defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched." Rest., Restitution, § 1, com. e.)

*See id.* (also citing Rest.3d Restitution and Unjust Enrichment (Discussion Draft 2000) § 1, com. c.)

Defendants have been unjustly enriched at Plaintiffs' expense and should be made to pay restitution. Defendants have taken a valuable commodity from Plaintiffs without compensating them for it and have invaded their privacy in the process. Defendants have occupied Plaintiffs personal property without permission and are using it as free information gathering device. Plaintiffs have made a valid claim for unjust enrichment that should not be dismissed at the motion to dismiss stage.

**G.   Sufficiency of Plaintiffs' Claims Unaffected by Rule 9(b)**

Specific Media is simply wrong about the application of Rule 9(b) to this lawsuit. (Dkt. 21 at 13). Because fraud is not an element of any of Plaintiffs' claims, there is simply no basis for simply dismissing Plaintiffs' entire Complaint. *See id.,* at 1102-1103 (observing that fraud is not an essential element in UCL claims); *see also*, *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F.Supp.2d 1156, 1164 (N.D.Cal. 2009) (fraud under the CFAA only requires a showing of unlawful access; there is no need to plead the elements of common-law fraud to state a claim under the CFAA). As Plaintiffs' claims allege, at most, misrepresentation and are thus not subject to Rule 9(b), there is no reason to require a more particular claim than that required by Rule 8.

## V.   CONCLUSION

For the foregoing reasons Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

1    DATED: March 8, 2011              Respectfully, submitted,

2                                        KAMBERLAW, LLC

3

4                                        s/David A. Stampley

                                          Scott A. Kamber

5                                        skamber@kamberlaw.com

6                                        David A. Stampley

                                          dstampley@kamberlaw.com

7                                        KamberLaw, LLC

8                                        100 Wall Street, 23rd Floor

                                         New York, New York 10005

9                                        Telephone:   (212) 920-3072

10                                      Facsimile:    (212) 920-3081

11                                      Interim Counsel for the Class

12

13    Avi Kreitenberg (SBN 266571)

     akreitenberg@kamberlaw.com

14    KamberLaw, LLP

     1180 South Beverly Drive, Suite 601

15    Los Angeles, California 90035

     Telephone:   (310) 400-1050

16    Facsimile:    (310) 400-1056

17

18    Joseph H. Malley (*pro hac vice*)

     malleylaw@gmail.com

19    Law Office of Joseph H. Malley

     1045 North Zang Blvd

20    Dallas, Texas 75208

21    Telephone:   (214) 943-6100

22

23

24

25

26

27

28